MEMPHIS COTTON PRESS & STORAGE CO v. C. C. HANSON, et al.

Western Section.    March 5, 1926.

Petition for Certiorari denied by Supreme Court March 12, 1927.

1. Evidence. The law presumes that all acts are done in good faith until there is evidence to the contrary.

Where different inferences may be drawn from the same state of circumstances, it is the duty of the court to presume in favor of innocent rather than of intentional and guilty misconduct. Again it is presumed that men intended to do what they have the right and power to do, rather than what is beyond their right and power.

2. **Attorney and client. An attorney will be presumed to have authority to make a compromise.**

Prima facie, the act of the attorney in making a compromise and entering or permitting to be entered a judgment is valid, because it is assumed the attorney acted with special authority, but when it is proved he had none, the judgment will be vacated

3. **Contracts. Evidence. Evidence held to show a valid contract to compromise debt.**

In an action to recover, twenty-five cents on the dollar for a debt against the Gulf Compress Company, where the evidence showed that one Captain Churchill had bought all other outstanding debts of this company and it was in evidence that his attorney had offered the complainant the same amount for its debt when it was declared by the court, held that the evidence showed a valid contract made by the attorney and ratified by Captain Churchill.

4. **Principal and agent. Agent contracting for his principal without authority is bound personally.**

Where one undertakes to make a contract for another, in writing or otherwise, without authority to do so, and therefore does not succeed in binding that other, he should make good the loss to the party with whom he deals. In so dealing, he warrants to the party with whom he is dealing that he has the power to make the contract as he undertakes to make it, and for the person for whom he undertakes to act, and in the absence of such authority his warranty of agency is immediately breached, and a right of action at once accrues to the injured party.

Appeal from Chancery Court, Shelby County; Hon. D. W. De Haven, Chancellor.

Affirmed.

W. P. Metcalf and T. K. Riddick, of Memphis, for appellant.

Siveley, Evans & McFadden, and Ewing, King & King, all of Memphis, for appellee.

OWEN, J. The defendants C. C. Hanson and Mrs. Churchill have appealed from a decree rendered in the chancery court of Shelby county for about $40,000, the Chancellor holding that Hanson was primarily liable to the complainant.

The complainant, a corporation, filed its claim in the Federal court against the Gulf Compress Company for a large amount, which claim pended for many years in the Federal court and was finally adjudicated in favor of complainant. It appears that the Gulf Compress Company was a large corporation, and in 1908 was operating fourteen or fifteen compresses in various States which compresses it owned, and was renting other compresses. A bill was filed in the Federal court alleging said Gulf Compress Company to be insolvent and asking that it be administered as an insolvent corporation. One of the largest creditors of the Gulf Compress Company was A. F. Churchill of Savannah, Georgia, referred to in the record as Captain Churchill. He was one of the complainants that instituted the suit in the Federal court asking

for a receiver for the Gulf Compress Company. It appears that complainant's bill was filed by a prominent firm of lawyers of the Memphis bar—Messrs: G. T. Fitzhugh and Albret Biggs. The defendant C. C. Hanson was President of the Gulf Compress Company. He was appointed by the District Judge as receiver for said company and as such receiver operated said Gulf Compress Company's properties until the year 1917. In May 1917 all of the properties of the Gulf Compress Company was sold at public sale and Capt. Churchill became the purchaser of all the compresses, save one, located at Ruston, Louisiana. The compress at Ruston, Louisiana brought about $25,000. The entire property brought the sum of $570. It appears that in 1916 the late Federal Judge, John E. McCall, was anxious to have the property sold and the case finally disposed of, but after a conference of all the attorneys, representing all the creditors, the complaint and the receiver, it was agreed that the receiver should operate the said presses another year. It further appears that the receiver had reported that the assets of the Gulf Compress Company aggregated $1,137,951.55, while the total indebtedness was $818,955.18, and it was the opinion of the creditors, the receiver, and all parties concerned that a continued operation of the compresses would be to the benefit of the creditors.

About $600,000 of the indebtedness of the Compress Company was known as secured debts, the remainder was unsecured and several claims were in dispute. The receiver was unable to pay any of the debts by operating the compress durnig the year 1916, and in March, 1917 the District Judge entered an order of sale and the properties of the Gulf Compress Company were sold by the receiver on the 22d day of May, 1917. This sale lacked more than $65,000 of realizing enough to pay the secured claims. There appeared to be nothing with which to pay the unsecured claims.

After the filing of the insolvent bill in the district court, A. F. Churchill (one of the complainants in that cause) in some way became the owner of all the secured claims against the property of the Gulf Compress Company, and also of all receiver's certificates. The total amount of these claims as fixed in the decree of the court was $636,473.67.

About the time that the order was entered to sell the property, Mr. Churchill also concluded that he wanted to buy all of the unsecured claims. With this in view, he employed Mr. Dan Elliotte, a prominent member of the Memphis bar and authorized him to pay twenty-five cents on the dollar for all unsecured claims that had been allowed. The explanation given of this desire of Mr. Churchill, to buy the claims, by all the witnesses was, that he was unwilling for the unsecured creditors to receive nothing on their claims,

and therefore, without regard to what the property would bring when sold, he was willing to pay them all 25% of their claims.

It appears that Mr. Elliotte purchased for Mr. Churchill ninety-seven of the one hundred unsecured claims. There was one claim which was not disputed, the creditor being the Southern Bagging Company. This concern refused to accept twenty-five per cent. The claim of the complainant and the claim of the Royal Insurance Company, both having large claims against the Compress Company, were disputed. The Royal Insurance Company, represented by Mr. Earl King, and the complainant represented by Mr. W. P. Metcalf and Hon. T. K. Riddick, all prominent members of the Memphis bar proceeded to establish their claims and were referred to a Special Master. The Special Master reported in favor of the complainant for two years rent, amounting to about $80,000. Upon appeal by the receiver it appears that the District Judge reduced complainant's claim to one year's rent, or about $40,000. While these proceedings were being carried on it is insisted that after Capt. Churchill had purchased all of the unsecured claims except these two, and the Bagging Company, which had declined the 25% offer, that agents and attorneys representing Capt. Churchill offered to pay complainant and the Royal Insurance Company twenty-five per cent of the amount that each should recover upon the final adjudication. It appears that the Royal Insurance Company was defeated in its claim in the final decree by the Circuit Court of Appeals. That court, modified the District Judge and increased the judgment of complainant to $121,625.52, which included interest for several years, and which judgment was rendered in favor of complainant in the Circuit Court of Appeals on the 21st day of January, 1921. The Supreme Court of the United States declined to reverse the judgment of the Circuit Court of Appeals rendered in favor of the complainant.

When this litigation was finally ended and complainant's claim was established, complainant insisted upon its 25% agreement as a settlement. This request was denied. During the prosecution of complainant's claim in the Circuit Court of Appeals, Capt. Churchill died. He published his last will and testament, making the defendant Mrs. Lois Churchill, his widow, his beneficiary and executrix. Shortly after the purchase of the compresses by Capt. Churchill, he sold the same to the defendant C. C. Hanson at the price that he (Churchill) had paid. The defendant Hanson agreed in his purchase from Capt. Churchill to assume all debts accrued or to accrue, which had been made in connection with Capt. Churchill's purchase of the compress property.

Complainant filed its bill in the instant case insisting that, under the agreement to pay 25% of its recovery the two defendants were

jointly liable to complainant in the sum of $30,407.88, with interest thereon from the date of the final recovery in the Circuit Court of Appeals. A compress, known as the Churchill compress, at Covington, Tennessee, was attached on July 4, 1923, the bill having been filed June 3, 1923, complainant insisting that it had an agreement with Capt. G. T. Fitzhugh, attorney for Capt. Churchill and C. C. Hanson, agent of Capt. Churchill, both having the authority to contract, whereby it was agreed that if complainant did not file any exceptions to the report of the Commissioner's sale and let the same be confirmed by the judge and the title to the properties of the Gulf Compress Company pass to Capt. Churchill, the purchaser, the complainants would be paid 25% of their final recovery, and treated in the same manner as Capt. Churchill had treated the other ninety-seven unsecured creditors. It is also insisted that the defendant C. C. Hanson is liable under the contract made with Capt. Churchill when he purchased the properties formerly owned by the Gulf Compress Company and assumed to pay all the debts that Capt. Churchill had incurred.

The defendants, in their separate answers, denied any liability. They denied that Capt. Fitzhugh represented Churchill at the time of the sale of the Gulf Compress Company; they denied that Hanson, as agent, could bind Churchill. While separate answers were filed, they were signed by same counsel, and are, in substance, practically the same. We quote from the answer of the defendant Hanson, as follows:

Defendant avers that as a result of the sales made by him as shown in his report to the court, filed May 22, 1917, and duly confirmed by the court on June 22, 1917, all the property of the Gulf Compress Company, real, personal or mixed, was disposed of and acquired by the purchasers at said sale, and the title to all of said property, both real and personal, was vested in and conveyed by proper muniments of title to the said purchasers and actually delivered to them. That after the sale and delivery of said properties to the purchasers, defendant's connection therewith as receiver absolutely terminated. That all active operations of the receivership were at an end; that the receiver had no assets, having parted with all of same in accordance with the orders of the court divesting and vesting title to all the property of the Gulf Compress Company in accordance with the decrees of this court. That he had no further duties whatever as receiver to discharge, except in connection with a few pending suits, about three in number.

"Defendant avers that possession of all the property and assets of the company in his hands as receiver were delivered as of August 31, 1917, and all liabilites of the receiver assumed by A. F. Churchill."

A number of depositions were taken after the pleadings were made up and among the attorneys who testified was Hon. Earl King, Hon. W. P. Metcalf, Hon. T. K. Riddick, Hon. C. L. Sivley and Hon. Dan Elliotte. Capt. Fitzhugh did not testify; neither of the defendants testified. We have before us a very large record consisting of three volumes. There are many exhibits consisting of documentary evidence, power of attorney, transfer of property, pleadings, and decrees in other suits connected with the litigation of the Gulf Compress Company.

The cause was submitted to Chancellor DeHaven, who reduced his findings of fact to writing. They are found in the record on pages 739 to 782, inclusive, covering forty-four pages of the record. We will not undertake to copy the findings of facts in this opinion, as it would make it entirely too long.

Both defendants excepted to the action of the Chancellor sustaining complainant's bill, prayed and were granted an appeal to this court and have perfected the same. While the appeal bond was executed jointly and each of the defendants' names are signed to the same and by the same attorney, in this court the defendants have been ably represented by different attorneys and each has filed a separate brief and each has assigned errors.

The defendant C. C. Hanson has assigned six errors: First: It was error to enter a decree against C. C. Hanson for the sum of $39,033.89, and the cost of the cause.

Second: It was error to decree that A. F. Churchill had assumed to pay one-fourth of complainant's claim against the Gulf Compress Company, and the Chancellor further erred in decreeing that defendant Hanson assumed to pay such debt by the last power of attorney executed by Churchill.

Third: The Chancellor erred in decreeing that the appellant is primarily responsible to the complainant for said debt and in ordering execution to first issue against the estate of Hanson.

The fourth, fifth and sixth assignments all go to alleged errors in the admission of certain testimony of the witness T. K. Riddick relative to a letter written by C. C. Hanson October 20, 1917, which letter is as follows:

"THE CHURCHILL COMPRESSES.

"Memphis, Tenn.
"October 20, 1917.
"File 154.

"Mr. T. K. Riddick,

"Memphis, Tenn.

"Dear Sir:

"In the matter of the claim of Merchants Cotton Press & Storage Company v. Gulf Compress Company, and C. C. Hanson, Receiver.

"Confirming the oral understanding had between you and Mr. Fitzhugh, I beg to say that Mr. A. F. Churchill has agreed in considering of your cooperation in the matter of the decree of the court for the sale, and other matters connected with the winding up of the estate, that regardless of the fact that all rights of creditors have been foreclosed by the confirmation of the sale, he would individually pay to your client, or you as attorney of record, twenty-five per cent of such final judgment as may be rendered in the court of last resort in the suit now pending in the U. S. Circuit Court of Appeals at Cincinnati, involving claims of the Merchants Cotton Press & Storage Company against the Gulf Compress Company and its receiver, and one-fourth of said judgment to be accepted in full satisfaction thereof.

"Yours very truly,
"(Signed) C. C. Hanson, Manager."

It is insisted that this letter is hearsay and an agents authority may not be proven by his own declaration.

The fifth assignment is in regard to the language of the witness Mr. Riddick when he said "I think Fitzhugh represented Churchill all along; I think he represented the receiver and Churchill both;" and the sixth assignment is Mr. Riddick deduced that Fitzhugh was Churchill's attorney because he was acting for him.

Mrs. Churchill has assigned three errors, as follows:

"First: The Chancellor erred in rendering a decree in any form against Mrs. Lois Churchill for the reason that the evidence fails to show that either Mr. Fitzhugh or Mr. Hanson had any right whatever to bind Capt. Churchill by an agreement to pay twenty-five per cent of the claim established by the Merchants Cotton Press & Storage Company.

"Second: The court erred in rendering a decree for $39,032.99 against Mrs. Lois Churchill upon the ground that the will of Capt. Churchill impressed his property with a trust for the payment of this claim or any other claim, for the reason that such an interpretation of the will is unsupported by the authorities.

"Third: The Chancellor erred in rendering a decree against Mrs. Lois Churchill in the sum of $39.032.99 on the theory that she was an executrix de son tort, for the reason that at the death of Capt. Churchill he in fact owned no property in the State of Tennessee and that long prior to that time he had sold all of his properties in Tennessee to his co-defendant Hanson."

We find as a fact that Capt. Fitzhugh made the promise to Hon. T. K. Riddick as set forth in the letter written by C. C. Hanson on October 20, 1917. Mr. Riddick testified that Capt. Fitzhugh's word was as good as a government bond when he made the proposition prior to the confirmation of the sale in May, 1917, but after it was

ascertained that both the Gulf Compress Company, or the receiver thereof, and the complainant had appealed to the Circuit Court of Appeals, Mr. Riddick suggested to Capt. Fitzhugh that on account of the uncertainty of life that their compromise proposition should be reduced to writing, and the record shows that Capt. Fitzhugh dictated the letter which the defendant Hanson signed, and which we have heretofore copied in this opinion. We find a letter from Mr. Earl King to his client, the Royal Insurance Company, showing that he had been offered twenty-five per cent of the amount that would be finally established. Mr. Dan Elliotte who had purchased the ninety-seven claims at twenty-five cents on the dollar testified that Capt. Churchill had a very kindly feeling for all the unsecured creditors of the Gulf Compress Company; that he had been associated with them in the "ups and downs" of that corporation and he did not want them to suffer a complete loss; that he would rather pay them twenty-five cents on the dollar and bear the loss himself than to see them lose completely.

The defendant Hanson in an answer sworn to by him, as receiver, to a claim filed against the Gulf Compress Company, for further evidence in the instant case, said: "Defendant (Hanson) avers that the said Churchill exhibited liberality in this matter which was commended in open court by the then presiding Judge, Honorable J. E. McCall, when he made known to the court on account of the cooperation of the unsecured creditors with the secured creditors during the period of the receivership, that he desired that they should have an opportunity to realize something on their claims, regardless of whether the property at a foreclosure sale brought in the amount sufficient for this property or not, and in accordance with this generous purpose he openly submitted an offer of twenty-five cents on the dollar to all the unsecured creditors for their claims."

It appears from the proof in the case that it was generally understood among all of the creditors of the Gulf Compress Company, and their counsel, that Capt. Churchill stood ready to pay twenty-five cents on the dollar for any unsecured claims when they were properly adjudicated or admitted to be correct. Capt. Fitzhugh was not making a new contract for Capt. Churchill. It appears that Capt. Churchill was in very bad health at the time of this litigation. As stated by some of the witnesses, he was "a sick man" and it was apparent that he would not live until complainants' claim was finally adjudicated. He showed a disposition to pay the unsecured creditors because of the fact that they had not pressed their claims in the Federal court, and he wanted the receiver who had been the president of the Gulf Compress Company and a close and intimate friend of Capt. Churchill, to operate the

Gulf Compresses' properties for eight years with the hope that it might pay the secured debts and something to the unsecured creditors.

Evidently Capt. Churchill was tired of the long-drawn-out litigation and he wanted to get matters finally settled and get it out of court.

After no exceptions had been filed to the commissioner's report of sale that would necessarily have delayed a confirmation, Capt. Fitzhugh signed the decree in behalf of the complainants, confirming the sale to the purchaser Churchill. It doesn't appear that there was any conflict between the interest of Churchill, the complainant and Hanson, the receiver. Capt. Fitzhugh represented both.

"The law presumes that all acts are done in good faith, until there is evidence to the contrary. Where different inferences may be drawn from the same state of circumstances, it is the duty of the court to presume in favor of innocent rather than of intentional and guilty misconduct. Again it is presumed that men intend to do what they have the right and power to do, rather than what is beyond their right and power." R. C. L., Vol. 10, p. 875.

In the case of United States v. Beebe, 180 U. S., 343, Mr. Justice Peckham, delivering the opinion of the court, said: "Prima facie, the act of the attorney in making such compromise and entering or permitting to be entered such judgment is valid, because it is assumed the attorney acted with special authority, but when it is proved he had none, the judgment will be vacated.

In the case of Walker v. Parker, 7 Cranch, 436, Mr. Justice Marshall, delivering the opinion of the court, said: "Although an attorney-at-law, merely as such, has strictly speaking, no right to make a compromise, yet a court would be disinclined to disturb one which was not so unreasonable in itself as to be exclaimed against by all, and to create an impression that the judgment of the attorney has been imposed on, or not fairly exercised in the case. But where the sacrifice is such as to leave it scarcely possible that, with a full knowledge of every circumstance, such a compromise could fairly be made, there can be no hesitation in saying, that the compromise being unauthorized, and being, therefore, in itself void, ought to be relieved against. The opinion is the more reasonable, because it is scarcely possible that, in such a case, the opposite party can be ignorant of the unfair advantage he is gaining. His conduct can seldom fail to be tainted with some disingenuous practice, or, if it has not, he knows that he is accepting a surrender of the rights of another, from a man who is not authorized to make it."

"An attorney may make an arrangement in writing for judgment and extension of the time of payment; and an agreement or compromise of a suit by an attorney, even though made without special authority, will not be interfered with unless it is so unreasonable as to warrant a belief that the attorney was imposed upon, or did not exercise his judgment fairly." Potter v. Parson, 14 Iowa, 286.

Complainant insists that it is reasonable to presume that Capt. Churchill knew of the agreement that Capt. Fitzhugh had made with Mr. Riddick and which was ratified by the defendant Hanson as manager, for the reason that after these agreements were made complainant's cause was appealed by the receiver of the Compress Company who had no money belonging to the Compress Company with which to print records and pay counsel for the prosecution of said appeal; that, as every vestige of the assets of the Gulf Compress property had been wiped out and swept away by the sale, there was no necessity of prosecuting an appeal; that unless there had been an agreement complainants would not have prosecuted their appeal. Counsel for the defendants stated in his testimony that he did not know who paid his fee for the prosecution of the appeal in behalf of the Compress Company. He was one of counsel for Capt. Churchill in the Gulf Compress litigation.

We are of opinion that Capt. Churchill did ratify this agreement; that he had this in mind when he had the defendant Hanson assume all of the debts of the Gulf Compress Company, accrued or to accrue, and all debts and claims had accrued, been fixed and terminated except the claims of the two complainants (the complainant and the Royal Insurance Company) and a similar agreement was made with the Royal Insurance Company as was made with complainant. We are of opinion that the defendant Hanson is liable under his assumption to Churchill when he purchased the properties of the Compress Company and agreed to pay or assume all debts, accrued or to accrue. Furthermore, we are of opinion that the defendant Hanson is liable by virtue of the letter that he wrote to Mr. Riddick.

Where one undertakes to make a contract for another, in writing or otherwise, without authority to do so, and therefore does not succeed in binding that other, he should make good the loss to the party with whom he deals. In so dealing, he warrants to the party with whom he is dealing that he has the power to make the contract as he undertakes to make it, and for the person for whom he undertakes to act, and in the absence of such authority his warranty of agency is immediately breached, and a right of action at once accrues to the injured party. Woodward v. Beasley, 2 Tenn.

Cyc., p. 339; Farmers Co-Operative Trust Co. v. Floyd, 47 Ohio, 525 (12 L. R. A., 346).

It results that the assignments of C. C. Hanson, Nos. 1 and 2 are overruled.

As to assignments No. 3, Hanson having purchased the property and assumed the debts, he certainly should be primarily liable, and this assignments is overruled.

It appears that there has been a suit of C. C. Hanson and Lois Churchill against the Director General, decided by the Supreme Court of Mississippi, reported in Southern Reporter, Vol. 95, page 787, that court holding that, ''Where a grantee in a contract of sale agrees as a part of the consideration for his purchase to pay the debts due by the grantor, accrued and to accrue, and enters into possession under such agreement, the creditors of the seller may sue the grantee directly on such undertaking and may recover personal judgment against him. This is especially true if the grantee acts for his vendor in contracting such debts.''

This principle, as announced by the Supreme Court of Mississippi, supra, is sustained by the Supreme Court of Tennessee in the case of Railroad v. Houstin, 85 Tenn., 224 and Rouchs v. Insurance Co., 111 Tenn., 405.

As to the three assignments of error insisted on by appellant and defendant Hanson in regard to the incompetency of the evidence of T. K. Riddick, these assignments were not discussed in appellant's printed brief. We are of opinion that the testimony was competent, and while the short excerpts from assignments five and six, if nothing else appeared in the record, would be conclusions or opinions, yet we find evidence to sustain Mr. Riddick's answers which are complained of and these assignments are overruled and disallowed.

Counsel for appellant Hanson has presented two very able briefs in behalf of their client, and the case was ably argued by all parties concerned, but we are satisfied with the findings of the Chancellor in regard to the defendant Hanson, and he is affirmed.

We will next discuss and dispose of the assignments presented by the defendant Mrs. Lois Churchill.

As to Mrs. Churchill's first assignment of error, it is overruled for the reasons heretofore stated in this opinion, applicable to the assignment of the same nature by the defendant Hanson. We are of opinion that Capt. Churchill was bound by the agreement made by Messrs. Fitzhugh and Hanson with Mr. Riddick.

As to the second and third assignments of error, we are of opinion that Mrs. Churchill bears the relation of a trustee under the will of Capt. Churchill and she is charged with the payment of her husband's debts. The legal title to the property attached at

Covington was in Capt. Churchill, the property having been attached a few days before the deed from Mrs. Churchill and others to the Shippers Compress Company was recorded, and we are of opinion that these two assignments are not well taken and they are overruled.

It results that all of the assignments of error as to both defendants are overruled and disallowed and the judgment of the lower Court is in all things affirmed.

The complainant will recover of the defendant's their rights against C. C. Hanson before proceeding against Mrs. Churchill, the amount of the judgment of the lower court with interest thereon, and all the cost of the cause, for which execution will issue against the defendants and their surety on appeal bond.

Heiskell and Senter, JJ., concur.